**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

THE BOARD OF REGENTS OF THE
NEW MEXICO SCHOOL FOR THE DEAF,
a New Mexico state educational institution,

        Plaintiff,

v.                                                               CV 06-01171 WJ/WDS

THE CITY OF SANTA FE, a New Mexico
municipal corporation,

        Defendant.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

The New Mexico School for the Deaf (NMSD) owns two parcels of land in Santa Fe, New Mexico. NMSD's main campus is located in downtown Santa Fe. In addition to this campus, NMSD owns approximately 261 acres of land west of Cerrillos Road and south of Rodeo Road. This land, known as the "Dairy Site," adjoins the Tierra Contenta subdivision in southwest Santa Fe. (Compl. ¶ 6.) In 1994, NMSD and the City of Santa Fe, along with several other parties, entered into an Annexation Agreement. (Compl. ¶ 7.) The Annexation Agreement annexes the Dairy Site, along with several other properties, into the City of Santa Fe. (Compl. ¶ 7.)

The Annexation Agreement, part of the City of Santa Fe's Master Plan, contemplated a multi-phase development plan for the properties subject to the Agreement and provided for the development of the Annexed property subject to a number of restrictions and concessions. For example, owners of the annexed property agreed to dedicate specific sections of land to the City for use as a City Park and to reserve specific sections of land as open spaces. (Compl. Ex. 1 § (8), (9).)

The property owners also agreed to develop landscaping along the major roads within each owner's property. (Compl. Ex. 1 § (9).) As part of the Agreement, the City also promised to provide City services to the annexed property. (Compl. Ex. 1 § (10).) The Agreement made extension of these services contingent upon the property owner's compliance with a number of provisions set out in the Annexation Agreement. (*Id.*)

Disagreement over the Water Service provision in Section 10 of the Annexation Agreement forms the central dispute underlying NMSD's claims against the City of Santa Fe. NMSD alleges that it "entered into the Annexation Agreement with the City in order to assure access to, and the availability of City services for, the Dairy Site property for future use and development by NMSD. Pursuant to the Annexation Agreement, the City agreed to extend City services, including water service, to the Dairy Site." (Compl. ¶ 8.) In return for such services, NMSD alleges that it "agreed expressly not to (a) permit the drilling of any wells on the subject property, (b) transfer any water rights from the property, or (c) divert water from the property."[1] (Compl. ¶ 8.) Additionally, NMSD alleges that it agreed to "connect its development of the Dairy Site to the municipal water utility, to construct necessary water lines, and to grant and dedicate easements and rights-of-way as needed for

---

[1] To avoid confusion, NMSD's Complaint must be read together with the Annexation Agreement. Section 10(C)(5) of the Agreement provides, "In exchange for receiving water service, no well shall be drilled on any property owned by the PRC Owners or Adjoining Owners after the Effective Date of this Agreement. No water rights shall be transferred to permit a diversion of water from the properties of PRC Owners and Adjoining Owners." (Compl. Ex. 1 § 10(C)(5).) Section 10(I) of the Agreement, however, provides that "[t]he provisions of this paragraph 10 do not apply to developments or improvements by the School for the Deaf as a state agency . . . ." The Agreement also provides that NMSD may develop the Dairy Site and connect to the City services pursuant to the Annexation Agreement if NMSD pays "the proportional sums otherwise required to be paid by NMSD Assigns for such Improvements." (Compl. Ex. 1 § 10(I).) NMSD's statement that it "agreed expressly not to (a) permit the drilling of any wells on the subject property, (b) transfer any water rights from the property, or (c) divert water from the property" must therefore be read in the context of the entire Agreement. (Compl. ¶ 8.)

2

extension of water services through the property." (Compl. ¶ 8.) NMSD also alleges that it agreed to "contribute to the cost of the City's multi-purpose trail system; to plant trees, enhance medians, and install landscaping along major roads; to develop park plazas; to contribute to the cost of main sewer lines; to dedicate sewer easements; to construct and pay for all sewer lines on its property; to construct and contribute to the costs of certain off-site roadway improvements; and to dedicate approximately 60 acres of the Dairy Site for park and open space use." (Compl. ¶ 9.) According to NMSD, it "accepted these obligations in good faith as an express condition to annexation in order to assure extension of City services to the Dairy Site in anticipation of NMSD's future needs, either as a possible NMSD campus or for development to provide revenue for improvement of NMSD's existing campus . . . ." (Compl. ¶ 10.) Lastly, NMSD alleges that under the Annexation Agreement, "the City agreed to approve development of the Dairy Site, if in accord with the City's Master Plan . . . ." (Compl. ¶ 11.)

On July 27, 2005, the City of Santa Fe enacted the Water Rights Transfer Ordinance (WRTO). (Compl. ¶ 18.) According to NMSD, the Ordinance, as applied to NMSD, would require NMSD "to acquire and transfer to the City consumptive water rights sufficient to meet the presumptive water demand established in the site water budget of the development plan for the Dairy Site, plus an additional 10% of the site water budget in order to accommodate water line loss." (Compl. ¶ 19.) NMSD alleges that "[a]pplication of the Ordinance to NMSD and its Dairy Site property would materially alter NMSD's rights and the City's obligations under the Annexation Agreement and would constitute a material breach of that Annexation Agreement." (Compl. ¶ 27.)

According to NMSD, as a result of the City's adoption of the WRTO and the City's expressed intention to apply the WRTO "to NMSD's Dairy Site and with respect to its proposed development

3

of the Dairy Site" (Compl. ¶ 29), NMSD sued the City and sought relief on the following grounds: 1) Breach of Contract; 2) Declaratory Judgment – Express Exemption; 3) Declaratory Judgment – Exemption by Estoppel; 4) Permanent Injunctive Relief; 5) Inverse Condemnation; 6) Estoppel Based Upon Vested Rights; 7) Breach of the Implied Covenant of Good Faith and Fair Dealing; and 8) Unconstitutional Impairment of Contract.

## Discussion

In its Motion to Dismiss, the City seeks dismissal of NMSD's claims pursuant to Rule 12(b)(6) for failure to state a claim and Rule 12(b)(1) for lack of jurisdiction. (Doc. 21.) The City specifically seeks to dismiss NMSD's First, Third, Sixth, Seventh, and Eighth Claims for failure to state a claim. (Doc. 21 at 8.) The City also contends that all eight of NMSD's claims are unripe and should be dismissed pursuant to Rule 12(b)(1) for lack of jurisdiction. (Doc. 21 at 11.) In its final argument, Defendant contends that "[a]ll of NMSD's state law claims should be dismissed due to the absence of pendant jurisdiction." (Doc. 21 at 14.) According to the City, "Because this Contract Clause Claim is subject to dismissal for failure to state a claim and lack of federal subject matter jurisdiction, the Court should also dismiss the state law claims in this Complaint for lack of pendent jurisdiction." (Doc. 21 at 14-15.)

### *Ripeness*

The City challenges the ripeness of NMSD's Contracts Clause claim under Rule 12(b)(1). *See New Mexicans for Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) ("The question of ripeness, like other challenges to a court's subject matter jurisdiction, is treated as a motion under Rule 12(b)(1)."). When deciding a 12(b)(1) motion, the court will accept as true well-pleaded factual allegations and will draw reasonable inferences in favor of the plaintiff. *United Transp. Union v.*

*Gateway W. Ry. Co.*, 78 F.3d 1208, 1210 (7th Cir. 1996). "In order for a claim to be justiciable under Article III, it must be shown to be a ripe controversy." *New Mexicans for Bill Richardson*, 64 F.3d at 1499. To satisfy Article III's case and controversy requirement, a claim must present an "injury in fact." *Nat'l Treasury Employees Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996). An injury in fact exists where an injury is "concrete and particularized and imminent or actual, as opposed to conjectural or hypothetical." *Roe #2 v. Ogden*, 253 F.3d 1225, 1229 (10th Cir. 2001). To satisfy the injury in fact requirement, a plaintiff must "allege concrete plans rather than mere 'some day intentions.'" *Verizon Wireless (VAW) v. City of Rio Rancho, NM*, 476 F. Supp. 2d 1325 (D.N.M. 2007) (quoting *Roe*, 253 F.3d at 1229).

      NMSD alleges that the City's adoption of the WRTO and proposed application of the WRTO to NMSD constitutes a breach of the Annexation Agreement and an unconstitutional impairment of NMSD's contract with the City. NMSD argues that the WRTO is "unenforceable against NMSD as a state educational institution because of the limitations of municipal authority over a state constitutional entity . . . ." (Compl. ¶ 28.) According to NMSD, "Imposition of the Ordinance is a material and substantial additional burden not contemplated by the Annexation Agreement." (Compl. ¶ 28.) NMSD appears to rely on two facts to support its claim that the WRTO will apply to NMSD. First, NMSD alleges that "the City has expressed its intention to apply the Ordinance to NMSD's Dairy Site and with respect to its proposed development of the Dairy Site." (Compl. ¶ 29.) Second, NMSD suggests that the absence of an express exemption in the WRTO for the Annexation Agreement with NMSD indicates that the WRTO will apply to any future development of the Dairy

Site.[2] (Doc. 26 at 6.)

Despite NMSD's argument that the WRTO applies to the Dairy Site, NMSD's claim fails to satisfy Article III's ripeness requirement. A claim is ripe where the injury is "concrete and particularized and imminent or actual, as opposed to conjectural or hypothetical." *Roe*, 253 F.3d at 1229. Moreover, a plaintiff must point to "concrete plans rather than mere 'some day intentions.'" *Verizon Wireless (VAW)*, 476 F. Supp. 2d at 1331 (quoting *Roe*, 253 F.3d at 1229).

NMSD does not point to an imminent and concrete injury necessary to satisfy Article III's ripeness requirement. NMSD contends that its "claims are ripe because they call upon the Court to determine the legal rights of the parties under the Annexation Agreement and the WRTO in circumstances under which the WRTO will effectively preclude property development provided for by the Annexation Agreement." (Doc. 26 at 8.) In support of this argument, NMSD relies on *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223 (10th Cir. 2004). The plaintiff in *Skull Valley Band* challenged Utah's licensing scheme for the storage of spent nuclear fuel. *Id.* at 1230. To support its ripeness challenge to the plaintiffs' claims, Utah argued that "(1) the [Nuclear Regulatory Commission] has not yet granted a license to [the plaintiff] for the SNF storage facility and issues surrounding the Department of the Interior's review of the lease have not yet been finally resolved and (2) [the plaintiff] failed to offer evidence that it would suffer any injury if the district court deferred its ruling until the NRC's final decision on the license application." *Id.* at 1237. The Tenth

---

[2] The WRTO itself provides that it applies to "[a]ny application for development review submitted after July 27, 2005" or "[a]ny application for building permit submitted after July 27, 2005." (Doc. 28 Ex. 2.) The WRTO does not apply to "projects for which an annexation agreement has been approved by the Governing Body prior to July 27, 2005, which specifically addresses water demand offset and the transfer of water rights to meet such water demand." (Doc. 28 Ex. 2.) The Annexation Agreement at issue here does not appear to address water demand offset or the transfer of water rights.

Circuit, in holding plaintiffs' challenge as ripe, observed that "the question of whether the federal licensing proceeding can now proceed without a separate Utah state licensing scheme imposing additional legal requirements upon [the plaintiffs] is a legal issue that currently affects the parties and may now be decided." *Id.* at 1238. *Skull Valley Band*, therefore, involved a legal determination of whether the plaintiffs could pursue federal licensing without interference from the Utah state licensing scheme. Resolution of this question did not depend on the NRC's ultimate decision regarding whether or not to issue a license to the plaintiffs. Rather, the plaintiffs' claim hinged on their right to pursue a license from the NRC free of allegedly preempted state laws.

Plaintiff's reliance on *Skull Valley Band* is misplaced. In *Skull Valley Band*, no factual dispute existed regarding the application of the state licensing scheme to the plaintiffs. In contrast, factual questions remain regarding whether the City will ultimately enforce the WRTO against a future development of the Dairy Site. NMSD has submitted no specific development plan to the City. Nor has the city reached a final decision regarding the WRTO's application to the Dairy Site in light of the Annexation Agreement. Thus, NMSD's claim that the WRTO breaches NMSD's rights under the Annexation Agreement hinges on events that may or may not occur. Such speculation illustrates the absence of an imminent and particularized injury essential to the injury in fact requirement under Article III. *Roe*, 253 F.3d at 1229; *see also Clinton v. Acequia, Inc.* 94 F.3d 568, 572 (10th Cir. 1996) ("[A] case is not ripe where the existence of the dispute itself hangs on future contingencies that may or may not occur.").

Additionally, NMSD's allegation that the City has expressed an intention to apply the WRTO to the Dairy Site does not constitute an injury sufficient to meet Article III's requirement of an injury in fact. Where a party challenges a local ordinance under the Contracts Clause, the economic impact

7

of the challenged action, and the extent to which the challenged action interferes with the party's expectations, "cannot be evaluated until the local zoning authority has arrived at a final, definitive position regarding how it will apply the ordinance at issue to the particular land in question." *Amwest Invs., Ltd., v. The City of Aurora*, 701 F. Supp. 1508, 1514 (D. Colo. 1988).

Here, the City has reached no final decision regarding the WRTO's application to the Dairy Site. As evidence of its injury, NMSD contends that to conform with the WRTO, NMSD will be forced to expend significant resources in producing plans for the development site as well as tendering water rights in compliance with the WRTO. Application for a variance with the City, however, does not appear to entail such burdensome requirements.  (Doc. 28 Ex. 2.) Without such burdensome procedures for seeking a variance, NMSD's fear that the WRTO will bar application for a variance and thus impede development of the Dairy Site appears misplaced. Moreover, the City may follow one of several routes upon NMSD's application for a variance. The City may waive application of the WRTO to the Dairy Site in light of the Annexation Agreement. The City may also reach a final decision comporting with NMSD's interpretation of the Annexation Agreement, thus eliminating any concern that the WRTO breaches the Agreement. Lastly, NMSD may pursue development of the land that does not trigger the WRTO's application, thus rendering unnecessary resolution of any alleged conflict between the WRTO and the Annexation Agreement. Without a final decision by the City, however, it is impossible to determine the avenue the City will take, and thus impossible to evaluate the scope, or even the existence, of an injury to NMSD. *See Hallco Envtl. Inc. v. Comanche County Board of County Comm'rs*, No. 97-6083, 1998 U.S. App. LEXIS 12596, at *19 (10th Cir. June 10, 1998) (holding that Contracts Clause claim was subsumed within plaintiff's Takings Clause claim and therefore unripe where the "particular economic impact on the property and the extent to which the

regulation interferes with reasonable investment-backed expectations for use of the property" could not be evaluated in the absence of a "final, definitive decision regarding how [the regulation] will apply to the particular property in question").

Similarly, NMSD fails to point to a concrete or particularized plan sufficient to give rise to an injury in fact. NMSD contends that it "has initiated a procurement process and entered into negotiations with a New Mexico non-profit corporation to serve as a development partner for the Dairy Site project, [but] these negotiations cannot be completed and a contract executed to proceed with the development until NMSD obtains a judicial interpretation of its position and rights under the Annexation Agreement." (Compl. ¶ 30.) Without an indication of the type of development sought at the Dairy Site, however, or the potential variances available to NMSD, it is impossible to determine the extent to which the WRTO applies to the proposed development of the Dairy Site and thus the extent to which the WRTO impairs, if at all, the City's commitments made in the Annexation Agreement. Adequate analysis under the Contracts Clause is impossible without such factual development. Moreover, such speculative plans cannot provide the foundation for an injury in fact sufficient to meet Article III's ripeness inquiry. *See Amwest Invs., Ltd.*, 701 F. Supp. at 1514 (reasoning that the ripeness analysis under the Takings Clause "applies equally to claims for the unconstitutional impairment of a contractual obligation because in order to determine the extent of the purported impairment, if any exists, a court must consider the economic impact of the challenged action and the extent to which it interferes with the plaintiff's reasonable investment-backed expectations"). Without an injury that is concrete and particularized and imminent or actual, and without concrete and specific plans that could give rise to an injury, NMSD fails to satisfy Article III's "case and controversy" requirement. Because NMSD's claim under the Contracts Clause fails

9

to satisfy Article III's ripeness requirements, I recommended that this claim be dismissed without prejudice for lack of subject matter jurisdiction.

### *Supplemental Jurisdiction Over*
### *NMSD's State Law Claims*

In light of my recommendation that NMSD's claim under the Contracts Clause be dismissed without prejudice for lack of subject matter jurisdiction, I also recommend that the state law claims in NMSD's Complaint be dismissed for lack of subject matter jurisdiction.[3] *See Jones v. Intermountain Power Project*, 794 F.2d 546, 549 (10th Cir. 1986) ("'If a federal claim against a party is dismissed before trial, the pendent state law claims should often be dismissed as well.'" (*quoting Bell v. Hood*, 327 U.S. 678, 682-83 (1946))). Where "the federal claim over which [the] court exercises original jurisdiction has been dismissed, the court should refrain from hearing the supplemental state law claims." *Yellow Cab Co. v. City of Chicago*, 3 F. Supp. 2d 919, 925 (N.D. Ill. 1998). As the Tenth Circuit observed, "By retaining jurisdiction over the state law claims and non-diverse parties pursuant to § 1367 supplemental jurisdiction, the district court exceeded its authority. Here dismissing the federal tort claims and the federal defendant for lack of subject matter jurisdiction stripped the district court of its original jurisdiction." *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1167 (10th Cir. 2004). The Court recognized, "'If the federal claim was

---

[3] NMSD raises two other federal claims. In NMSD's Second Claim for Relief, NMSD raises a claim for "Declaratory Judgment – Express Exemption." (Compl. at 10.) In NMSD's Third Claim for Relief, NMSD raises a claim for "Declaratory Judgment – Exemption by Estoppel." (Compl. at 11.) I will assume for purposes of this PFRD that NMSD brings its two claims for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. The Declaratory Judgment Act authorizes a federal court to entertain a request for declaratory relief only in "a case of actual controversy within its jurisdiction." 28 U.S.C. § 2201. The Declaratory Judgment Act, however, "is remedial and does not itself confer jurisdiction." *Rector v. City and County of Denver*, 348 F.3d 935, 946 (10th Cir. 2003). Thus, NMSD's claims under the Declaratory Judgment Act do not establish independent federal claims on which the district court's jurisdiction may depend.

dismissed for lack of subject matter jurisdiction, a district court has no discretion to retain the supplemental claims for adjudication. The dismissal means that there never was a valid claim within the court's original jurisdiction to which the state claims may be supplemental. Therefore, the district court has no discretion to exceed the scope of its Article III power, and must dismiss the state law claims without prejudice.'" *Estate of Harshman*, 379 F.3d at 1168 n.3 (quoting 16 JAMES WM. MOORE et al., MOORE'S FEDERAL PRACTICE § 106.66[1] (3d ed. 2004)). Accordingly, in light of the dismissal of NMSD's Contracts Clause claim, I conclude that NMSD's state law claims should be dismissed without prejudice for lack of jurisdiction.

### Conclusion

For the reasons stated above, I recommend that:

1) NMSD's claim under the Contracts Clause be dismissed without prejudice for lack of subject matter jurisdiction; and

2) NMSD's state law claims be dismissed without prejudice for lack of jurisdiction.

**THE PARTIES ARE NOTIFIED THAT WITHIN 10 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636 (b)(1). **A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the Proposed Findings and Recommended Disposition. If no objections are filed, no appellate review will be allowed.**

*William P. Lynch*
WILLIAM P. LYNCH
UNITED STATES MAGISTRATE JUDGE